# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | GEORGE W. LINDBERG | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 948 | **DATE** | JUN 2 9 2001 |
| **CASE TITLE** | Goodman v. Carter | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment is granted in part and denied in part. Defendants are given 30 days from the date of this order to show why summary judgment should not be entered in plaintiff's favor on his tarot card and diet claims. Plaintiff will have 30 days thereafter to respond, and defendants an additional 15 days to reply.

*(25-1)*

(11) ■ **[For further detail see attached Memorandum Opinion and Order.]**

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 0 2 2001 | |
| X | Docketing to mail notices. | date docketed | 49 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CLH | courtroom deputy's initials | CO-7 FILED FOR DOCKETING 01 JUN 29 PM 3: 15 | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |



**DOCKETED**

JUL 0 2 2001

GEORGE P. GOODMAN,                )
                                  )
    Plaintiff,            )
                                  )
    v.                    )    No. 2000 C 948
                                  )
ASSISTANT DEPUTY DIR. CARTER,     )
ASSISTANT DEPUTY DIR. THOMAS ROTH, )    Judge George W. Lindberg
WARDEN JAMES PAGE,                )
ASSISTANT WARDEN SPRINGBORN,      )
CHAPLAIN COHN, and                )
CHIEF CHAPLAIN FONTAINE,          )
                                  )
    Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff George P. Goodman, an inmate in the custody of the Illinois Department of

Corrections (IDOC) at Stateville Correctional Center, brings this *pro se* action pursuant to 42

U.S.C. § 1983 claiming that defendant IDOC officials LaMarck Carter, Thomas Roth, James Page,

Jerome Springborn, Donald Cone[1] and William Fontaine have violated his First Amendment right to

free exercise of his religion and his Fourteenth Amendment right to equal protection of the laws.

Defendants have filed a motion for summary judgment to which Goodman has responded.


## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law. FED .R. CIV. P. 56(c). The party moving

for summary judgment has the initial burden of submitting affidavits and other evidentiary material to

show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249 (1986). Once the moving party has sustained the initial burden, the opposing party

---

[1] Plaintiff misspelled defendant's last name as "Cohn." The court will use the correct spelling of defendant's
name.

may not rest upon the mere allegations or denials of the pleadings, but instead must come forward with specific evidence, by affidavits or as otherwise provided in Rule 56, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## II. FACTS

In April 1999, Goodman converted to the Wicca religion.[2] He then asked Chaplain Cone if he could be allowed incense and tarot cards. He also asked to receive a vegetarian diet compatible with his Wiccan beliefs. Chaplain Cone refused his request. In his declaration in opposition to defendants' motion, Goodman claims that he filed a grievance on April 11, 1999, but it was never addressed.[3]

On September 13, 1999, Carol Jushkewich, a dietician, responded to a letter from Goodman, advising him that IDOC does not recognize a vegetarian diet for the general population and that he should contact Chaplain Cone about obtaining the vegan diet followed by the "Black Hebrew Israelites." A vegan diet contains no animal or animal by-products, such as eggs or dairy products. It is thus more restrictive than the vegetarian diet which Goodman requested.

On October 28, 1999, Assistant Warden of Programs Jerome L. Springborn denied Goodman's request to purchase tarot cards and advised Goodman to utilize established grievance procedures.

On November 2, 1999, Assistant Deputy Director Thomas P. Roth responded to a letter from Goodman advising him that his concerns had been reviewed with administrative staff at Stateville

---

[2] Wicca, according to exhibits submitted by Goodman, is a form of neo-paganism, a belief system and way of life based upon a modern reconstruction of pre-Christian Celtic traditions. Wicca recognizes both male and female manifestations of divinity, and its festal times are tied to the cycles of nature. It emphatically dissociates itself from the popular conception of "witchcraft" as worship of Satan or evil powers. Wicca has been recognized as a religion for First Amendment purposes. *Dettmer v. Landon*, 799 F.2d 929, 932 (4th Cir. 1986).

[3] Goodman has not produced a copy of this grievance. Georgia Schonauer, the Grievance Officer at Stateville Correctional Center, states that only the Committed Person's Grievance Report dated November 9, 1999, and the Grievance Officer's Report dated June 24, 2000, were located. (Schonauer Aff. ¶ 5.) Nevertheless, Goodman's declaration is made under penalty of perjury and hence is the equivalent of an affidavit. 28 U.S.C. § 1746. For purposes of a motion for summary judgment, the court is required to accept Goodman's statements as true.

and Chief Chaplain William Fontaine. Roth advised Goodman that if he disagreed with the denial of his request to purchase tarot cards, he should utilize established grievance procedures. Roth stated that the request for a religious diet was under review, and a letter had been sent to Priestess Morgaine Stormcrow[4] to obtain information about dietary requirements for members of the Church of Wicca.

On November 9, 1999, Goodman filed a grievance asking for authorization to possess tarot or rune cards, a religious medallion, sea salt, and incense, and to be placed on the existing vegan diet. After Goodman did not receive a response to this grievance within 45 days as provided in Section 504.830 (d), he appealed to the Administrative Review Board (ARB) on January 17, 2000. On February 5, 2000, the ARB returned Goodman's grievance telling him to use the grievance process. On February 11, 2000, Goodman filed this suit with the United States District Court.

On June 24, 2000, Goodman received a response to his November 9, 1999 grievance, stating that his concerns had been appropriately answered in the September 13, 1999, October 28, 1999, and November 2, 1999, memos.

## III. ANALYSIS

### A. Threshold Issues

#### 1. Exhaustion of Administrative Remedies

Defendants argue first that Goodman did not exhaust his administrative remedies before he lodged his complaint on February 11, 2000. Under 42 U.S.C. § 1997e(a), part of the Prison Litigation Reform Act (PLRA),[5] the court is directed to dismiss a suit brought with respect to prison conditions if the court determines that a plaintiff has failed to exhaust his administrative remedies prior to filing suit. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532 (7th Cir. 1999).

---

[4] Goodman identifies Morgaine Stormcrow as a high priestess in the Gardarian tradition. (Goodman Dep. at 45.) Ms. Stormcrow has identified herself in her letters as "Morgaine Stormcrow, Hps, Rainbow Warrior Coven."

[5] 42 U.S.C. § 1997e(a) provides:
No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The exhaustion requirement was further explained in *Massey v. Helman*, 196 F.3d 727, 733 (7th Cir. 1999):

> [I]f a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before filing a claim. The potential effectiveness of an administrative response bears no relationship to the statutory requirement that prisoners first attempt to obtain relief through administrative procedures.

IDOC's administrative grievance system is set out in the Illinois Administrative Code. Inmates must follow these procedures: (1) The inmate must first attempt to resolve the situation through his counselor. (2) If the situation remains unresolved, he may file a written grievance within six months of the incident or six months after the receipt of a decision concerning an informal resolution with the facility's grievance officer. Upon completion of an investigation by the grievance officer, the conclusions, and, if necessary, recommendations, are forwarded to the Chief Administrative Officer. (3) If the inmate does not believe the situation is resolved, he may appeal to the Director of the IDOC. The Administrative Review Board as the Director's designee reviews the appeal of the grievance and determines whether a hearing is necessary. (4) The Administrative Review Board forwards its decision and any recommendations to the Director or other designee, who makes a final determination. 20 Ill. Admin. Code § 504.810-850.

Whether Goodman exhausted his administrative remedies turns on what actually happened with the November 9, 1999, grievance. Although neither party has alluded to it in their pleadings, defendants attached a copy of Goodman's November 9, 1999, grievance to their motion for summary judgment, which includes the counselor's response. (The copy of the grievance that Goodman attached to his complaint does not have the response.) It is dated November 10, 1999, and signed by R. Glenn. It states that the counselor spoke with the mailroom supervisor, who said that Goodman could not have tarot cards. What happened then is a mystery. It is not clear whether the counselor was supposed to have forwarded the grievance to a Grievance Officer or if the counselor was supposed to act as a Grievance Officer. Either way, according to 20 Il. Admin. Code 504.805(d), the Grievance Officer was supposed to have reported his or her findings and recommendations in writing to the Chief Administrative Officer within 30 days after the grievance

4

was received, whenever possible. In this instance, that should have been done on or near December 10, 1999. The Chief Administrative Officer was supposed to advise the committed person of the decision in writing within 15 days after receiving the Officer's report, whenever possible. This should have been done on or near December 25, 1999.

This did not happen. Although the 45 days for responding to a grievance is not an absolute deadline, as Goodman suggests, a response to a grievance should fall within the ballpark. Defendants contend that Goodman did receive his response--on June 30, 2000, more than seven months after Goodman filed his grievance. The response stated that Goodman's concerns had been appropriately answered in the September 13, 1999, October 28, 1999, and November 2, 1999, memos. Both the October 28 and November 2 memos had instructed Goodman to utilize the grievance process, which is what Goodman then did by filing the November 9, 1999, grievance.

When he did not receive a timely response to his grievance, Goodman could have submitted yet another one or inquired about the status of his grievance.[6] Instead, he filed a grievance with the ARB, which told him to utilize the grievance process, which Goodman had already attempted to do. After receiving this response from the ARB on February 5, 2000, Goodman lodged this action on February 11, 2000, that is, about 45 days after the response to his grievance was due.

A prisoner, of course, has no federal *right* to receive a timely response to a grievance, or to receive any response at all. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430-31 (7th Cir. 1996); *Goins*

---

[6] The court recognizes that under Illinois law, Goodman could have gone to state court to seek a writ of mandamus on the ground that the prison officials required to process his grievance arbitrarily failed to act on his grievance. *See West v. Gramley*, 262 Ill.App.3d 552, 556-57, 634 N.E. 2d 1261, 1265 (Ill. App. 4th Dst. 1994) ("We have previously recognized prisoners may file a complaint for *mandamus* to compel DOC officials to perform as required under the rules adopted by the DOC"). However, even a sophisticated litigator, let alone a *pro se* litigant, might not be aware of such a remedy. This would also enmesh state judicial remedies with the administrative remedies that the PLRA requires to be exhausted. Several courts have determined that the plain language of § 1997 e(a) means only remedies that are "administrative" in nature and "policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent," *Jenkins v. Morton*, 148 F.3d 257, 259 (3d Cir. 1998) (quoting *Patsy v. Board of Regents*, 457 U.S. 496, 513 (1982)). *See also Rumbles v. Hill*, 182 F.3d 1064, 1070 (9th Cir. 1999) ("Legislative history [of the PLRA] also suggests that the statutory phrase 'administrative remedies' refers exclusively to prison grievance procedures"). The court accordingly determines that, although the state court remedy of mandamus is available, a prisoner is not required to resort to it in order to exhaust his administrative remedies under the PLRA. The court notes that requiring a prisoner to file a writ of mandamus if prison officials do not respond to his grievance would likely result in protracted delays in the resolution of a prisoner's grievance.

*v. Washington*, No. 97 C 7244, 1998 WL 30704 (N.D. Ill. Jan. 26, 1998) (Kocoras, J.). But the purpose of the PLRA's exhaustion requirement was to assure that available internal remedies would be utilized, not that judicial remedies would be foreclosed.

Although the Seventh Circuit has not addressed this specific question, the Fifth Circuit has determined that a "prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired." *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999), *citing Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir. 1998); *cert. denied*, 526 U.S. 1133 (1999). Judge Alesia of this court also determined that a prisoner had exhausted his administrative remedies when the prisoner did not receive a written response from the Administrative Review Board after a hearing on the appeal of the grievance despite contacting the ARB twice. *Jones v. DeTella*, 12 F.Supp.2d 824, 826 (N.D. Ill. 1998).

Goodman made reasonable efforts to have his grievance addressed, and he did not file this action until 45 days after the Chief Administrative Officer's decision, which he never received, was due. The court will not read 42 U.S.C. § 1997e(a) so narrowly as to require an inmate to do more than is required of him by the administrative process, or to permit IDOC to exploit the exhaustion requirement through indefinite delay in responding to grievances. The court accordingly deems Goodman's administrative remedies exhausted because IDOC officials did not respond to his grievance within the time frame set forth in 20 Il. Admin. Code 504.805(d).

### 2. Official Capacity Liability

Defendants contend that they may not be sued in their official capacities. They are partially correct. An official-capacity suit against a state officeholder is effectively an action against the state itself, and a state is not a "person" who may be sued under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). But although this rule, as well as the Eleventh Amendment, bars official-capacity claims for damages against state officials, *Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992), *cert. denied*, 508 U.S. 942 (1993), the Supreme Court in *Will* noted that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983

because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (*quoting Kentucky v. Graham*, 473 U.S., at 167, n. 14). Such claims for prospective relief are not barred by the Eleventh Amendment. *Power v. Summers*, 226 F.3d 815, 819 (7th Cir. 2000). And although the court cannot enjoin the payment of money, it can order the correction of a constitutional violation even though it may cost the state to remedy it. *Id.* at 820.

Goodman seeks prospective injunctive relief as well as damages. The difference between injunctive relief against a defendant in his official capacity rather than merely in his individual capacity is that an official-capacity injunction would bind the state of Illinois. If Goodman wins injunctive relief in this suit, and the Department of Corrections transfers him to another institution, he should not have to bring a fresh action to establish his rights against a different warden who was not a party to this suit. Accordingly defendants' motion is granted with respect to damage claims, but denied with respect to prospective relief.

### 3. Personal Liability of Warden Page and IDOC Assistant Deputy Directors Carter and Roth

Defendants are correct that personal involvement is required for liability under § 1983. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (*quoting Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994).

But defendants misstate the law when they assert that "the mere act of denying a grievance does not provide the basis for liability under § 1983." (Defendants' Brief at 5.) All three of the above-cited opinions accept that a prison official's disregard of a grievance can subject him or her to liability. Not that liability necessarily follows; it may not have been that official's responsibility to deal with the problem, or the official may have believed that it was being properly handled by subordinates, absolving him or her of the required mental state of "deliberate indifference." And, of

7

course, if the plaintiff's injury is complete at the time the grievance is filed, denying the grievance or failing to respond to it cannot be grounds for liability because it caused no injury. But defendants' flat statement of the law is simply wrong.[2]

Defendants cite *Crowder v. Lash*, 687 F.2d 996 (7th Cir. 1982), which does not support this sweeping statement. *Crowder* involved a claim against the director of corrections for the state of Indiana; the Seventh Circuit concluded that receipt of an individual prisoner's grievance was insufficient to impose liability upon him:

> The logical import of [Crowder's] theory, however, would be to hold any well informed Commissioner of Corrections personally liable for damages flowing from any constitutional violation occurring at any jail within that Commissioner's jurisdiction. We believe that such a broad theory of liability is inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action. [citations omitted]

> Crowder has not presented evidence indicating that Heyne participated personally in any of the deprivations which form the basis for Crowder's damage claims, nor does Crowder's testimony indicate that any of the challenged actions occurred at Heyne's direction or with his express consent. We therefore uphold the district court's determination that defendant Heyne was entitled to a directed verdict on all aspects of plaintiff's § 1983 claims.

*Crowder*, 687 F.2d at 1006. Where a defendant has the direct responsibility of reviewing and responding to grievances, however, denial of a grievance can constitute his "express consent" to the perpetuation of the conditions complained of in the grievance.

As far as it appears in the record, defendants Carter and Roth, as Assistant Deputy Directors of IDOC, were not responsible for responding to grievances. The chain of responsibility set forth in IDOC regulations runs from the Grievance Officer to the Warden to the Administrative Review Board. If Carter and Roth had any responsibility with respect to Goodman's complaints, it was limited to passing them onto the proper channels. Summary judgment will be granted as to defendants Carter and Roth.

---

[2] In *Verser v. Elyea*, 113 F.Supp.2d 1211, 1215-16 (N.D. Ill. 2000), Judge Bucklo rejected an identical argument made by the Attorney General on behalf of IDOC defendants, citing both *Black* and *Gentry*. Defendants' counsel here represented defendants in that case. Counsel's misstatement of the law and failure to cite controlling authority is ethically unacceptable, particularly where the opposing party is unrepresented.

In contrast, Warden Page, to whom grievance dispositions were sent for review, stands in an entirely different position and is not entitled to summary judgment on this ground. He raises the additional argument that he cannot be liable because he delegated this responsibility to unnamed subordinates. This relieves him of personal knowledge, hence, he contends, personal responsibility.

In other words, for Warden Page, "the buck stops somewhere else." Under 20 Ill. Admin. Code § 504.805(a), Warden Page may delegate his duty to review inmate grievances. Nevertheless, he may not play a "shell game," delegating responsibility without disclosing to whom it is delegated, then denying personal responsibility when a prisoner seeks to hold him accountable. While it would be unreasonable for a prisoner to believe that the head of a state department of corrections would give personal attention to every inmate letter, as in *Crowder,* it is not unreasonable for prisoners to believe that the warden reviews their grievances when they are purportedly signed by him.[8/] It is, of course, not the court's business to tell Warden Page how to do his job. But IDOC regulations *prima facie* place him on the hook of personal responsibility, and he cannot expect to be taken off without putting someone else on it.

There is another reason for denying summary judgment as to Page. Even if Page has no liability for damages, as the Chief Executive Officer of Stateville he is the person to whom an injunction would properly be addressed. Summary judgment is accordingly denied as to him.

### B. Applicable Law
#### 1. First Amendment Analysis

In order to state a claim for relief under § 1983, a plaintiff must allege sufficient facts to show that defendants deprived him of some right secured by the Constitution or federal law. *Parrat v. Taylor,* 451 U.S. 527, 535 (1981). Inmates do not forfeit all of their constitutional protections by reason of their confinement, and retain the First Amendment right to practice their religion. *O'Lone*

---

[8/] Page states in his affidavit that he receives "upwards of one hundred fifty Adjustment Committee Summaries, seventy-five Incident Reports and thirty Institutional Inquiry Board Summaries each week to be reviewed and signed." (Page Aff. ¶ 3.) Absent a showing that many of these require more than cursory review, this does not appear to be an overwhelming burden.

*v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Nevertheless, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Id. (quoting Price v. Johnston,* 334 U.S. 266, 285 (1948)). "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* Regulations alleged to infringe constitutional rights are valid if "reasonably related to legitimate penological objectives." *Id.* at 349; *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999), the Seventh Circuit discussed whether the later case of *Employment Division v. Smith*, 494 U.S. 872 (1990), had superseded the approach of *Turner* and *O'Lone* to prisoners' free exercise claims. *Smith* held that Oregon could deny a claim for unemployment benefits brought by an employee discharged for using peyote for ritual purposes on the ground that such use, forbidden by Oregon law, qualified as work-related "misconduct" justifying the denial of benefits. The Supreme Court held that the Free Exercise Clause was not offended if a generally applicable and otherwise valid law requires or forbids the performance of an act that an individual's religious belief forbids or requires, as long as this is merely an incidental effect, and the object of the law is not to burden the exercise of religion. *Id.* at 878-80.

If *Smith* rather than *O'Lone* governed prison rules, prison administrators would not even be required to articulate a valid penological purpose to support regulations infringing on religious practice, as long as that infringement was incidental and not the purpose of the regulation. Prisoners could be forbidden to wear head coverings, for example, or compelled to work every day of the year. But noting that *Smith* was not a prison case and *O'Lone* had not been overruled, the Seventh Circuit held that *O'Lone* would continue to govern in the prison context. *Sasnett*, 197 F.3d at 292.

Under *O'Lone* and *Turner*, "[a] prisoner's right to freely exercise his religious beliefs does not depend upon his ability to pursue each and every aspect of the practice of his religion [citations omitted]. A prison may restrict a prisoner's ability to adhere absolutely to a particular tenet of his religion, and if the prison has sound penological interests supporting the restriction and, if those

interests outweigh the prisoner's religious interests, the restriction does not violate the First Amendment." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). But while prison administrators need only make reasonable efforts to afford inmates an opportunity to practice their faith, they must be evenhanded. *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994).

The Seventh Circuit, following *Turner*, has identified several factors relevant to evaluating the reasonableness of a prison regulation impacting First Amendment rights:

> 1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;
>
> 2. whether there are alternative means of exercising the right in question that remain available to prisoners;
>
> 3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and
>
> 4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

*Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991), *quoting Williams v. Lane*, 851 F.2d 867, 877 (7th Cir. 1988), *cert. denied*, 488 U.S. 1047 (1989). A standard of reasonableness, rather than heightened scrutiny, applies in the prison context to permit prison administrators "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration[,]" and thereby prevent unnecessary federal court involvement in the administration of prisons. *Id.* (*quoting Turner*, 482 U.S. at 89).

Although Goodman asserts an equal-protection claim as well, the protection afforded religious practice by the Equal Protection Clause is no greater than that granted by the First Amendment. As stated above, the First Amendment requires evenhanded treatment of different religions to the extent practicable, and the state may not favor one religion over another. The Equal Protection Clause does not reach state action that is neutral on its face and has a non-discriminatory purpose that merely has the effect of interfering with religious practice. *See Personnel Administrator v. Feeney*, 442 U.S. 256 (1979) (employment preference for veterans, who are overwhelmingly men, did not violate equal protection). In contrast, the First Amendment does require the state to justify facially neutral measures that burden religious practice, at least in the prison context where *O'Lone* and

*Turner* govern rather than *Smith*. At most, equal protection analysis would apply the same rational basis test as *O'Lone* and *Turner*: "Unequal treatment among inmates is justified if it bears a rational relation to a legitimate penal interest." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988). For this reason, a separate equal-protection analysis of Goodman's claims is unnecessary.

### 2. Illinois Religious Freedom Restoration Act

In response to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), intending to restore pre-*Smith* standards of First Amendment scrutiny of government actions. After the Supreme Court held in *City of Boerne v. Flores*, 521 U.S. 507 (1997), that Congress lacked the power to impose RFRA on the states, many states, including Illinois, passed their own, similar statutes. Illinois' Religious Freedom Restoration Act (ILRFRA), 775 ILCS 35/5 *et seq.*, provides that:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15. ILRFRA provides for a private cause of action:

> If a person's exercise of religion has been burdened in violation of this Act, that person may ... obtain appropriate relief against a government. A party who prevails in an action to enforce this Act against a government is entitled to recover attorney's fees and costs incurred in maintaining the claim or defense.

775 ILCS 35/20. A "government" "includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the State of Illinois or a political subdivision of the State, including a home rule unit." 775 ILCS 35/5. It is unclear whether "appropriate relief" includes damages, actual or punitive.[2]

---

[2] The court has found no authority addressing the question of availability of damages under ILRFRA. A law journal summary for practitioners is also silent on this issue. *See* Lisle A. Stalter, *A Practical Overview of Illinois' Religious Freedom Restoration Act*, 88 ILL. B.J. 96 (Feb. 2000).

Defendants assert that the court should not apply ILRFRA because it was not mentioned in Goodman's complaint, but only in his response to their summary judgment motion. They argue that if Goodman wants to raise a claim under ILRFRA, he should amend his complaint. (Defendants' Reply at 4-5.) A complaint, however, need not set forth the plaintiff's legal theories. The Seventh Circuit has noted the "misconception" "that a complaint must set out, and that its validity depends on, a legal theory, such as 'due process' or 'equal protection.' That is not so: matching facts to a legal theory was an aspect of code pleading interred in 1938 with the adoption of the Rules of Civil Procedure." *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). While there are circumstances in which it would be unfair to permit a plaintiff to invoke a new legal theory in opposition to a motion for summary judgment, that is not the case here.

Nevertheless, the court will not treat Goodman's claims as brought under ILRFRA as well as the First Amendment. Supplemental jurisdiction under 28 U.S.C. § 1367 is discretionary. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500-501 (7th Cir. 1999). Among other reasons, the court may decline jurisdiction when the state-law claim "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Few issues arising under ILRFRA have been addressed by either federal or state courts. Reported cases decided under the federal RFRA are not binding, and federal RFRA jurisprudence was hardly well-developed by the time *City of Boerne v. Flores* virtually shut down RFRA litigation. A law review article discussing state-law RFRA clones, such as ILRFRA, noted the many open questions they present:

> The generic language does not resolve what standard of culpability the plaintiff must prove to establish a prima facie case and whether, as a defense, individual officials sued under the act may assert absolute or qualified immunity. The language is equally unhelpful in determining whether a state or local governmental entity may be held vicariously liable for violations of the religious freedom act by governmental employees acting in the scope of their employment or whether the entity may assert any immunity from liability. Finally, the text does not resolve whether punitive damages are embraced within the "appropriate relief" recoverable against the named individual or entity defendant.

Gary S. Gildin, *A Blessing in Disguise: Protecting Minority Faiths through State*

13

*Religious Freedom Non-Restoration Acts*, 23 HARV. J.L. & PUB. POL'Y, 411, 479-480 (Spring 2000).

To this list may be added the crucial question of the application of ILRFRA to prisons. The Illinois legislature probably intended ILRFRA to restore pre-*Smith* First Amendment jurisprudence. But in the prison context, the standard of review for First Amendment claims before *Smith* was *not* the "least restrictive means" test, but the "rational relationship" test of *Turner* and *O'Lone*. A court addressing the application of ILRFRA to prisoners' claims would have to determine whether to follow the plain language of the statute or imply an exception for prisoners' claims. All of these questions should preferably be addressed by Illinois courts in the first instance.

Finally, although the state has not raised the issue, there is an Eleventh Amendment problem. ILRFRA defines the defendant against whom relief may be awarded as "a government." While "government" is defined to include officials acting under color of state law, it may well be that "government" under ILRFRA was intended to correspond to "employer" under Title VII. A Title VII "employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(b). Nevertheless, while it is understood that individual agents act for employers and can render them liable, relief is proper only against the "employer," not the agents personally. *See, e.g., Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998). Similarly, ILRFRA may be intended to permit relief only against a "government," here the State of Illinois.

If this were the case, Goodman's ILRFRA claims would clearly be barred by the Eleventh Amendment. But even if ILRFRA permits the entry of "relief" against individual officials, the problem remains. It is established that individual state officials may be sued personally under 42 U.S.C. § 1983 for both injunctive relief and damages for acts done in their official capacities. *Hafer v. Melo*, 502 U.S. 21 (1991); *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974). However, as was explained in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102 (1984), this derives from the rationale first articulated in *Ex Parte Young*, 209 U.S. 123, 160 (1908), that because a state cannot authorize an act contrary to the Constitution, a state official violating the

Constitution is "stripped of his official or representative character and [was] subjected to the consequences of his official conduct." This rationale is inapplicable when the state official is accused of violating state rather than federal law:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst*, 465 U.S. at 106. As the Seventh Circuit has stated, "[e]nforcement of state law against a state is not a task that the eleventh amendment permits a federal court to perform. [citing *Pennhurst*.] *Young* leaves the door of the federal courthouse ajar for claims based on federal law, but only if *Young*'s premises obtain." *David B. v. McDonald*, 156 F.3d 780, 784 (7th Cir. 1998), *cert. denied*, 525 U.S. 1145 (1999).

Goodman's ILRFRA claim, in essence, asks this court to "instruct state officials on how to conform their conduct to state law." As *Pennhurst* also made clear, such a state-law claim may not be entertained under this court's supplemental jurisdiction simply because a proper § 1983 claim is also presented. *Pennhurst*, 465 U.S. at 121. The court accordingly dismisses Goodman's ILRFRA claims without prejudice, and will treat his claims here as brought solely under the First Amendment.[10]

### C. Goodman's Claims
#### 1. Denial of Incense

Defendants assert that Goodman was denied the use of incense because of the risk of fire and complaints from other prisoners and because it can be used to mask prohibited and unlawful activities such as marijuana use. (Springborn Aff. ¶ 5.) This justification has a rational relationship to the legitimate penological purpose of detecting illegal drug use, and it has been accepted in many judicial opinions. *See Spies v. Voinovich*, 173 F.3d 398, 405 (6th Cir. 1999); *Dettmer v. Landon*,

---

[10] While Eleventh Amendment immunity may be waived, such waiver must be "unequivocally expressed." *Pennhurst*, 465 U.S. at 99. There is no such waiver here.

799 F.2d 929, 933-34 (4th Cir. 1986), *cert. denied,* 483 U.S. 1007 (1987); *Childs v. Duckworth,* 705 F.2d 915, 921-22 (7th Cir. 1983); *Bagwell v. Brewington-Carr,* No. Civ.A. 97-714-GMS, 2000 WL 1239960, *7 (D. Del. Aug. 25, 2000); *Doty v. Lewis,* 995 F.Supp. 1081,1085 (D. Ariz. 1998). As there are legitimate penological reasons unrelated to the practice of religion for banning incense, Goodman does not have a viable First Amendment claim. The court accordingly grants defendants' motion for summary judgment with respect to the denial of incense.

### 2. Denial of Tarot Cards

Defendants contend that Goodman was denied tarot cards because they present a potential danger to prison security. Assistant Warden Springborn states in his affidavit that "[t]he use of tarot cards presents a potential danger to prison security because they may be used to manipulate and control other prisoners and could lead to unpredictable behavior and violence because they are highly symbolic." (Springborn Aff. ¶ 4.)

Prison security is, of course, a compelling state interest. Courts must show deference to the expertise of professionals who manage penal institutions. But deference is not a rubber stamp; "a reasonableness standard is not toothless." *Abbott v. Thornburgh,* 490 U.S. 401, 414 (1989). Before acceding to the judgment and discretion of prison administrators, a court should have evidence that their judgment and discretion have been exercised. Assistant Warden Springborn's cursory affidavit does not explain how forbidding Goodman to have tarot cards is reasonably related to prison security.

Many religious texts, and certainly most religious rituals, are "highly symbolic." If one ignores the pejorative connotations of "manipulate and control," it is commonplace for believers in more conventional religions to invoke supernatural assistance to change others' behavior ("please, God, make my husband sober"), or use their religious texts as authority to induce those changes ("the Bible tells you not to do that").

The relevant question, which Springborn's affidavit does not address, is "manipulate and control" to do what. In the case of some religious materials, the potential adverse effects are clear

16

enough. Courts have upheld prohibitions on religious texts describing sadistic or orgiastic rituals, or fomenting racial hatred. Courts have upheld prison administrators in refusing to permit prisoners to possess *The Satanic Bible*, for example. The Eleventh Circuit explained why this was rationally related to prison security:

> W.E. Johnson, Warden of Holman Prison, testified that upon review of *The Satanic Bible,* he concluded that persons following its teachings would murder, rape or rob at will without regard for the moral or legal consequences. Moreover, Warden Johnson thought that the plaintiff's safety would be threatened if other inmates became aware of the contents of *The Satanic Bible.*

> .... A "master counselor" of a Satanic sect testified that the premise underlying all of the teachings in *The Satanic Bible* is that life should be lived according to individual desires without regard for conscience or consequences. Certain portions of the book are somewhat harsher. For instance, in the chapter entitled "The Book of Satan," author Anton Szandor LaVey states that right and wrong have been inverted too long. He challenges readers to rebel against the laws of man and God. Furthermore, LaVey declares that hatred of one's enemies is of utmost importance; revenge should be a top priority.

> Clearly, practices such as those described above, and the beliefs that encourage them, cannot be tolerated in a prison environment since they pose security threats and are directly contrary to the goals of the institution.

*McCorkle v. Johnson*, 881 F.2d 993, 995-96 (11th Cir. 1989); *See also Doty v. Lewis*, 995 F.Supp. 1081, 1086 (D. Ariz. 1998) (denial of *Satanic Bible*); *Carpenter v. Wilkinson*, 946 F.Supp. 522, 529 (N.D. Ohio 1996) ("[N]o deference [to prison administrators] is necessary because the Court is in complete agreement that large portions of *The Satanic Bible* have great potential for fomenting trouble of all kinds in a prison setting").

Here, however, Goodman's exhibits describing Wicca contain no suggestion that tarot cards, or Wiccan practices or beliefs, tend to incite violence or anti-social behavior, and defendants have submitted nothing to the contrary.

It appears that the defendants' primary concern is the use of tarot cards for divination, or, to use the more disparaging word, fortune telling. Goodman has been permitted color images of a full set of tarot cards, upon which he can meditate, but which cannot be used for divination. (Plaintiff's declaration p. 5.) Defendants do not explain how using tarot cards for divination would impact

prison security. Defendants cite *Reese v. Coughlin*, 1996 WL 374166 (S.D. N.Y. 1996), and the court will assume that they have adopted its rationale.[11] According to *Reese*:

[T]here is a "valid, rational connection" between restricting access to tarot cards and legitimate security interests. Wayne L. Strack, Deputy Commissioner of Security at New York Correctional Facilities, explained ... that CORC has repeatedly refused inmate requests for tarot cards, because "tarot cards serve a primary function as fortune-telling devices in certain occult factions" and often permit one individual to "control or influence another." (Strack Aff. ¶¶ 6-7). Strack went on to explain that "practices that permit or encourage inmates to control or strongly influence the conduct of other inmates pose serious risks to the security and safety of the facility." (*Id.* ¶ 7). Because deference is accorded prison administrators' judgment and the reasonable basis test is designed to allow prison administrators to "anticipate security problems," defendants can establish a valid, rational connection based on their past experience and intimate knowledge of institutional safety concerns. In this case, they need not point to an actual incident in which the use of tarot cards caused a breach of security. The connection here between the regulation and the important penological interest is not so "remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

This court does not have the record in *Reese* before it, but these statements are unpersuasive.[12] A "rational relationship" is one that can be explained and understood by a judge; the test is not satisfied by a bare pronouncement by an administrator that something is a security risk. Deputy Commissioner Strack's reference to "certain occult factions" suggests the kind of uninformed disapproval of the unfamiliar that in other contexts is called bigotry. It does not appear that Strack explained how tarot cards would permit a prisoner to "control or influence another," or "control or influence" him to do what. That is not to deny that there are harmful and destructive religious practices, but they must be shown to be such; they cannot be proscribed because they are "occult" or "superstitious" or "cultic."

[11] Defendants also cited *Jackson v. Lewis*, 163 F.3d 606, 1998 WL 636757 (9th Cir. 1998), for this proposition. However, this is an unpublished opinion not to be cited as precedent.

[12] Defendants assert that "plaintiff provides no case law to refute the case law already provided by the defendants substantiating their claim that tarot cards are a security issue. [T]here is no issue of genuine material fact. ... [H]e wants them and we will not let him have them. This is a question of law and the defendants have provided the Court with case law while the plaintiff does not." Reply at 7. Defendants are confused. Whether forbidding tarot cards is rationally related to legitimate security concerns is a question of fact, not a question of law, and questions of fact are not decided by citation to legal authority. This court is not required to find persuasive what another district judge found persuasive -- particularly when the evidence before that judge is not before this court.

18

To look for supernatural communication in the interpretation of ostensibly random events such as the sequence of cards in a shuffled deck, tosses of a coin, or the flight of birds (the origin of the word *auspicious*) is found in many religions, and the same desire to make a personal connection to the hidden order of the universe probably lies behind the appeal of secular gambling.[13] While the Judeo-Christian tradition disapproves of both gambling and divination (although not without exception),[14] divination is integral to some other traditions. Many followers of Taoism, for example, utilize the *I Ching*, an ancient book of oracles consulted by repeatedly separating heaps of yarrow stalks or by tossing coins. I CHING: THE CLASSIC CHINESE ORACLE OF CHANGE: THE DIVINATORY TEXTS WITH CONCORDANCE (Rudolf Ritsema & Stephen Karcher trans., Eranos Foundation 1994). The corresponding *I Ching* text is used both for meditation (explicating the questioner's inner state) and divination (explicating the state of the outer world and its likely response to the questioner). It appears that something like this is what Goodman proposes to do with his tarot cards. It may be nonsense to adherents of religions that do not believe in divination, but it *is* religious. "Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Board, Indiana Employment Security Division*, 450 U.S. 707, 714 (1981).

If Goodman can generate persuasive interpretations from tarot cards, it may give him a certain status among fellow prisoners, but prisoners win status for a variety of reasons, most of them far less savory than this. Goodman can be prevented from exploiting other prisoners by charging money to tell fortunes, just as any prisoner can be prevented from earning money from any other skill.

Goodman has also raised a question of evenhanded treatment. According to an undated letter written to Warden Page by Morgaine Stormcrow, Goodman's Wiccan teacher and advisor, "tarot cards are used in the pagan faith as both tools of divination and meditation aids. Because of their

---

[13] While IDOC regulations prohibit gambling for anything of value, DR 302, 20 Ill. Admin. Code § 504 Table A, inmates are allowed to have conventional decks of playing cards. Although the conventional deck lacks the aura of its medieval ancestor, the tarot deck, it is perfectly serviceable for both gambling and divination.

[14] Israelite kings apparently consulted the "Urim and Thummim," some kind of oracle, *see* 1 Samuel 28:6, while the Apostles cast lots to determine who was to replace Judas Iscariot. Acts 1:24-26.

mystical symbols, they are oftimes [sic] used in learning. ... they [tarot cards] are quite important to us, as important as a bible would be to a Christian. ... [T]o a pagan, the tarot is not a game, or a toy, but a mystical tool learned to bring one to a deeper level of consciousness."

Although defendants call this a "self-serving statement," (Defendants' Reply at 6), they have offered nothing to rebut it.[15] Defendants assert that the color reproductions of the faces of tarot cards are an adequate substitute. (*Id.* at 6-7.) They are not, as they cannot be shuffled, dealt and arranged. In any event, it is not for defendants to determine what a Wiccan should find religiously equivalent. *Cf. Sasnett,* 197 F.3d at 293 (telling Protestants that a cross with a rosary is equivalent to a cross without one is like "tell[ing] Anglicans to kiss the Pope's ring but pretend he's the Archbishop of Canterbury"). Defendants argue that "the tarot cards are not absolutely mandatory to plaintiff's faith," (Defendants' Brief at 9). It is also true that one can be a Christian without a Bible, or a Muslim without a Koran, but no one would suggest that Christian or Muslim prisoners be denied their holy books -- even though each can be used to "manipulate and control" other prisoners, are "highly symbolic," and contain material that adherents of other religions would find offensive. The court accordingly finds that defendants have not met their burden of proof, and summary judgment is denied on the issue of tarot cards.

### 3. Denial of a Vegetarian Diet

Defendants present two arguments in their motion. First, they assert that vegetarianism is not a tenet of Wicca, but is merely recommended. Since one can practice Wicca without being a vegetarian, Goodman's First Amendment right to exercise his religion has not been infringed. Second, assuming, arguendo, that Wicca requires a vegetarian diet, Goodman was offered a vegan diet, which he acknowledges is consistent with his beliefs. Goodman does not deny that some Wiccans are not vegetarians, but he asserts that he wishes to avoid meat and meat products for religious reasons. Goodman states that he initially accepted the vegan diet, but when he tried to

---

[15] It is unclear how a third party's statement can be called "self-serving." Stormcrow has no apparent interest in this litigation, other than as a sympathetic co-religionist.

supplement it with items containing eggs and dairy products purchased from the commissary, which his beliefs permit, defendants removed Goodman from the vegan diet. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 7.)

For the purpose of a motion for summary judgment, the court accepts that Goodman's beliefs are sincerely held. He personally believes he should be a vegetarian, that is, abstain from food made from dead animals, and he has shown that vegetarianism is recommended, if not required, by the Wiccan religion.[16/] Vegetarianism is thus a tenet of Goodman's religion, even if it is not a tenet of Wicca generally. Defendants' objection was directly addressed in *Thomas, supra.* The petitioner, a Jehovah's Witness, had been denied unemployment compensation after he resigned rather than work on weapons. The fact that another Jehovah's Witness did not share the same scruple, said the Court, was irrelevant: "[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. ... [I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Thomas*, 450 U.S. 707, 715-16 (1981). *Accord, Smith*, 494 U.S. at 886-87 (plurality opinion) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim").

So Goodman's vegetarian convictions are accordingly entitled to First Amendment protections. Why was the vegan diet not a satisfactory accommodation? Because, Goodman responds, it required him to give up milk products and eggs, which he otherwise could eat.

Defendants complain that Goodman "basically argues that [he] needs a diet to himself." (Defendants' Reply at 7.) Defendants miss the point. There is no question that a prison is not required to accommodate mere dietary preferences. But the court does not understand why

---

[16/] Goodman's exhibits include an undated letter from Morgaine Stormcrow to Assistant Warden Springborn, stating: "While not all pagans, and in this case Wiccans are vegatarian [sic], we do endorse the vegatarianism [sic], and greatly encourage our Initiates, Priestess's [sic] and Priests to follow it." Another of Goodman's exhibits, a publication called *Basic Wicca According to Journey to the One*, states at page 25: "A large percentage (compared to the general population) of Wiccans are vegetarian, not only for health reasons, but because of the reverence for life in all forms."

Goodman is being denied eggs and milk products -- which he is willing to pay for himself -- for no articulated reason. It is clear that his eating these foods is not inconsistent with his beliefs, nor does it demonstrate that they are not sincerely held. The court acknowledges that a prison has a legitimate interest in "keeping its food service system as simple as possible." (Defendants' Reply at 8.) But defendants do not explain how permitting Goodman to purchase items that are apparently regularly stocked by the commissary has any effect on the food service system. As far as appears on this record, denying Goodman the privilege of purchasing these foods from the commissary has no rational relationship to any legitimate purpose whatever. Therefore defendants' motion for summary judgment is denied with respect to Goodman's claim that he is being denied a vegetarian diet.

### D. Qualified Immunity

Government officials performing discretionary functions are entitled to a qualified immunity that shields them from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether an official may be held personally liable for his or her unlawful actions, therefore, turns on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotations omitted). In order to be "clearly established," the contours of the legal right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). However, a plaintiff need not show that the very action in question has previously been held unlawful. *Id.*

In reviewing a claim of qualified immunity, the court asks two questions: (1) whether the plaintiff has asserted a violation of a constitutional right, and (2) whether the applicable constitutional standards were clearly established at the time in question. *May v. Sheahan*, 226 F.3d 876, 881 (7th Cir. 2000). Goodman's first claim, denial of incense, failed the first test. With respect to the second claim, denial of tarot cards, there was meager case law, with some cases supporting defendants' position and none supporting Goodman. It was not clearly established that a Wiccan

had a First Amendment right to possess tarot cards, and qualified immunity is appropriate on this claim.

Goodman's third claim presents a more difficult question. While Wiccans are relative newcomers to First Amendment law, it was established that First Amendment rights depend on a sincerely-held religious belief, not adherence to a recognized religion or sect. *United States v. Seeger*, 380 U.S. 163, 185 (1965). It was also well-established that a prison had to make reasonable accommodations to prisoners' religiously-based dietary requirements. *Hunafa v. Murphy*, 907 F.2d 46 (7th Cir. 1990).

Defendants did offer Goodman the vegan diet, which met his religious scruples, but at the cost of forgoing foods that were religiously permitted to him. What the court finds troubling is that Goodman could have been given what he wanted at *no* additional cost or inconvenience to prison personnel. Nor is it reasonable to suppose that other inmates would be unduly resentful or jealous of Goodman's purchasing commissary food with his own money. Assuming that providing a vegan diet imposed a burden on the institution, the institution would have had a legitimate interest in determining that prisoners had requested such a diet out of sincere religious belief rather than mere whim. But while the institution could validly require a prisoner asking for a special diet to comply with the tenets of his professed faith, defendants effectively required Goodman to accept the restrictions of *another* faith.

Reasonableness is the key to the *O'Lone - Turner* test, and defendants did not act reasonably. Would a reasonable official have recognized that Goodman's First Amendment rights were being infringed? In prisons, as in other large organizations, there is a fair amount of irrationality; in general the Constitution does not mandate reasonable prison administration. Nor is the Constitution normally concerned with a prisoner's diet, and a prisoner has no right to choose his food: "A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required." *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994). Defendants might well have believed that because their demand that Goodman forgo eggs and milk did not require him to violate any tenet of his religion, they had not violated the First Amendment.

Nevertheless, while the court may speculate as to defendants' thinking, the test for qualified immunity is objective, not subjective. Once the court determines that a right was "clearly established," that is, it would have been clear to a lawyer or a judge, the court cannot indulge the notion that it might not have been clear to the average correctional officer or administrator. It was clear that a burden on a prisoner's religious practice had to be rationally related to some legitimate penological purpose. Without such a purpose -- and neither institutional inertia nor bureaucratic pique qualifies as one -- there is no qualified immunity.

### E. Summary Judgment for Goodman?

Defendants have not shown that they are entitled to summary judgment with respect to denial of tarot cards and a non-vegan vegetarian diet. On the present record, Goodman would himself be entitled to judgment on these claims. The court accordingly proposes to grant summary judgment for Goodman on these claims, unless defendants can show a dispute of material fact exists, reserving for trial only the question of damages. *See Goldstein v. Fidelity and Guaranty Insurance Underwriters, Inc.*, 86 F.3d 749 (7th Cir. 1996).

## IV. CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted for all defendants with respect to damage claims asserted against them in their official capacities. Summary judgment is granted in favor of defendants Carter and Roth on all claims. All claims under ILRFRA are dismissed without prejudice. Summary judgment is granted in favor of defendants on Goodman's claim relating to denial of incense. Summary judgment is denied with respect to Goodman's claim relating to the denial of tarot cards, except that the court finds that all defendants have qualified immunity. Summary judgment is denied with respect to Goodman's claim relating to the denial of a non-vegan vegetarian diet.

Defendants are given 30 days from the date of this order to show why summary judgment should not be entered in Goodman's favor with respect to liability on his tarot card and diet claims. Goodman will have 30 days thereafter to respond, and defendants an additional 15 days to reply.

IT IS SO ORDERED

George W. Lindberg
United States District Judge

JUN 2 9 2001

Date: _____