Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | GEORGE W. LINDBERG | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 948 | DATE | November 28, 2002 |
| CASE TITLE | | Goodman v. Carter | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  The court finds that there are material issues of fact and denies summary judgment to plaintiff. Plaintiff's motion to request sanctions on defendants [55], motion for limited evidentiary hearing [54], and motion to compel discovery [59] are denied. Erik L. Kantz, Arnstein & Lehr, 120 S. Riverside Plaza, Ste. 1200, Chicago, IL 60606 (312/876-6671), is appointed to represent plaintiff. Status hearing is set for December 19, 2001, at 9:30 a.m.

(11) ■ [For further detail see attached order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | NOV 29 2001 | 60 |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 01 NOV 28 PM 2:09 | date mailed notice | |
| CLH | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
NOV 2 9 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE P. GOODMAN, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 2000 C 948 |
| ASSISTANT DEPUTY DIR. CARTER, ASSISTANT DEPUTY DIR. THOMAS ROTH, WARDEN JAMES PAGE, ASSISTANT WARDEN SPRINGBORN, CHAPLAIN COHN, and CHIEF CHAPLAIN FONTAINE, | ) ) ) ) ) ) ) | Judge George W. Lindberg |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On July 2, 2001, in *Goodman v. Carter*, 2001 WL 755137 (N.D. Ill.), the court granted summary judgment for all defendants with respect to damage claims asserted against them in their official capacities. The court granted summary judgment in favor of defendants Carter and Roth on all claims. The court granted summary judgment in favor of defendants on Goodman's claim relating to denial of incense. However, the court denied summary judgment with respect to Goodman's claim relating to the denial of tarot cards and the denial of a non-vegan vegetarian diet. Defendants LaMarck Carter, Thomas Roth, James Page, Jerome Springborn, Donald Cone, and William Fontaine have filed a Sur-Response to Plaintiff's Motion for Summary Judgment. Goodman has filed a reply, along with a motion for limited evidentiary hearing and a motion to request sanctions on defendants. Defendants have filed a reply to plaintiff's response to defendants' sur-response.

In their sur-response, defendants state that it appears that the courts wants two questions answered: (1) What is the legitimate basis for denying Goodman the tarot cards and (2) why cannot Goodman remain on the vegan diet and purchase items from the commissary? The court will address each of these questions in turn.

## I. TAROT CARDS

Defendants claim that according to Warden Kenneth R. Briley,[1] whose affidavit is attached as Exhibit A, it is the perception of tarot cards and not any legitimate spiritual effects that they may have that controls his decision not to allow tarot cards in the prison. Warden Briley bases his observation that possession of tarot cards by Goodman or any other inmate would present serious security concerns on his 20 years of experience in various security positions and as a correctional administrator. (Briley Aff. at ¶ 7.) Because many Stateville inmates are easily manipulated by other inmates, he believes that tarot cards may be used as a means to manipulate or control the thoughts and actions of vulnerable inmates. (*Id.* at ¶ 8.) Inmates with tarot cards would be able to convince vulnerable inmates that the possessor of the cards has special powers to predict events or to cast spells and thus achieve power over them. Warden Briley anticipates that inmates will use tarot cards to obtain favors or property from other inmates, to intimidate other inmates or staff, to persuade other inmates to commit an act of aggression or violence against another inmate or staff member compromising security or to cause the inmate to harm himself. (*Id.* at ¶ 9.) Warden Briley states that the successful prediction of events from tarot cards would convince certain inmates, and even some staff, that Goodman or any other inmate tarot card reader had special powers, which would give such inmate significant power and influence over others, and thus be a security problem. (*Id.* at ¶ 10.) Warden Briley would expect that inmates with tarot cards would attempt to charge fees or extort items of personal property in exchange for a reading. Such trafficking could lead to physical altercations. (*Id.* at ¶ 11.) Warden Briley gave several examples in his affidavit in which the use of tarot cards to predict certain events, such as a riot in the prison or serious or life-threatening illness or harm to an inmate or his family, could result in serious security concerns or harm to an inmate. (*Id.* at ¶ 13.)

---

1 Warden Briley assumed this position on July 1, 2000, after this action was filed and is not a named defendant.

2

After reviewing literature on tarot cards, Warden Briley voiced other concerns. Because persons who own tarot cards are instructed not to allow any other person to touch them, an inmate with tarot cards might react violently toward inmates or staff who touched their tarot cards. (*Id.* at ¶ 14.) Warden Briley was concerned about images on the tarot cards that depicted acts of violence, such as an individual hanging from the neck by a rope to a tree (The Hanged Man) and an individual using a club to strike animals (Strength). These images present a security concern because inmates might attempt to copycat or mimic the actions of the tarot cards. (*Id.* at ¶ 15.)

Because the use of tarot cards indicates a ritual of burning a candle and wafting smoke from herbs to purify the cards--items which inmates are not allowed--an inmate might try to burn torn clothing or a blanket strip to get smoke to accompany the tarot card reading. This would increase the risk of fires in the institution. (*Id.* at ¶ 17.)

Possession of tarot cards by Goodman or another inmate could result in unauthorized movement because other inmates might attempt to gain access to his cell in order to have a tarot card reading. (*Id.* at ¶ 18.) Even if Goodman himself did not engage in fortune telling or any other unauthorized use of the cards, they could be stolen and used by other inmates for illegitimate purposes. (*Id.* at ¶ 19.)

Dennis Hopkins, who is the Chief of Mental Health Services for the Illinois Department of Corrections, also provided an affidavit in regard to the possession of tarot cards by Goodman or any other inmate. After reviewing some material about tarot cards, he concluded that a common perception is that they are used for or believed to be able to predict events. In his professional opinion, the possession of tarot cards by inmates creates a likelihood that inmates will use the cards to manipulate, gain favors from, gain power over, and victimize other inmates. (Hopkins Aff. at ¶ 4.)

In his response, Goodman claims that Warden Briley and Dr. Hopkins's affidavits merely reargue the same issue the court found unpersuasive in its July 2, 2001, opinion. The court agrees. As it stated at *11, "[t]he relevant question, which Springborn's affidavit does not address, is 'manipulate and control' to do what. In the case of some religious materials, the potential adverse

3

effects are clear enough. Courts have upheld prohibitions on religious texts describing sadistic or orgiastic rituals, or fomenting racial hatred. Courts have upheld prison administrators in refusing to permit prisoners to possess *The Satanic Bible*, for example."

The main thrust of Briley and Hopkins's affidavits argues that tarot cards may be used for fortune telling, which could cause any number of security problems. Although the court defers to the expertise of correctional officials as to the many problems that could be caused if in inmate were perceived as having special powers because he could ostensibly foresee the future, it questions why tarot cards have been singled out. If fortune telling is the problem, then even a common deck of cards could be used in this manner, and yet officials do not suggest banning playing cards. Goodman has in fact tendered as Exhibit E a copy of a page of a catalog offering various books on fortune telling with playing cards. It does not take too much imagination to think of the simplest items that could be perverted into fortune-telling devices, if the inmate were so inclined–an arrangement of spoons or black marks on paper or coffee grounds, for example.

Goodman addresses concerns that some of the images on tarot cards depict acts of violence by pointing out that the picture of the hanged man that defendants proffered (Defendants' Exhibit A) does not portray a man hanging by his neck, as Warden Briley states. Rather, the man is tied by the ankle to a tree. Although it is a bizarre position, there is no sign of grotesque disfigurement, as might be seen in an actual hanging; in fact, the man does not appear to be suffering at all. Goodman also points out that the card depicting strength has also been misinterpreted by Warden Briley who states that it shows a man striking an animal. Although the photocopy itself is not clear, the text states that the image shows the man and the animal poised for battle against a common enemy. Goodman adds that there are more than 150 different tarot decks with their own imagery.

Goodman counters defendants' contention that photographs, literature and images depicting violence are banned from the prison setting by pointing out that the Bible, Torah, and Christian icon cards are allowed. In particular, Goodman points out that an icon card, The Crucifixion of Our Lord, is distributed by staff clergy at Stateville. This card depicts a man hanging from a cross with spikes through his extremities, stabbed in the side, and dripping blood on a human skull. Putting

4

aside two thousand years of history and the prevalence of Christian symbolism in our society, this is exactly what the card pictures. This card, of course, has deep religious significance for Christians, but not for Jews, or Buddhists, or, as in Goodman's case, Wiccans.

Defendants have posed many and varied scenarios as to how the misuse of tarot cards could create significant security concerns in the prison setting. Security is undoubtedly of paramount importance in a maximum security facility such as Stateville, and Warden Briley is ultimately responsible for the well-being of approximately 2,700 inmates and 900 staff members. (Briley Aff. at ¶ 2.) Goodman has countered each scenario with equally cogent arguments as to why tarot cards should not be singled out as a device that might undermine these legitimate security concerns. The court is still left with the question: What characteristic is so intrinsic to tarot cards that legitimate security concerns may be compromised? The court finds that defendants still have not answered this question. In fact, the court wonders if Warden Briley even looked at the cards that were tendered as exhibits because his description of them does not match the cards themselves. However, the court recognizes that if Goodman is allowed tarot cards, more requests from other inmates will follow. Before such a determination should be made, the court wants to hear more evidence, and not necessarily from experts who are obviously biased in favor of the Illinois Department of Corrections.

## II. VEGETARIAN DIET

Defendants claim that allowing inmates participating in vegan diets to supplement their diet with non-vegan food from the commissary would seriously impair Stateville's ability to monitor and remove inmates not adhering to their religious diets and would increase requests for such religious diets, thus increasing demands on Stateville expenditure and staff resources. (Briley Aff. at ¶ 20.) Warden Briley states, that based on his experience, some inmates deliberately request special diets, citing religious grounds, as a manipulative maneuver and to cause the prison administration additional expense and work. The Illinois Department of Corrections therefore has a policy to remove an inmate from a special diet if he is caught with food not on the diet. At one time, more than 125 inmates were on a vegan diet based on their request as Hebrew Israelites.

5

When their commissary purchases were checked, conflicts with their diet limitations were found, and the number on the diet was reduced to 49. (*Id.* at ¶ 23.) Warden Briley states that because of the increased expense and difficulties in providing religious diets, it is important to monitor adherence to the diets. Because staff must monitor the diets, it would be extremely difficult for staff to know the subtleties of each inmate's beliefs and which items in the commissary would be permissible. (*Id.* at ¶ 27.) Allowing Goodman to supplement a vegan diet with purchases from the commissary would place him in a unique situation and open the door to other inmates seeking similar treatment. (*Id.* at ¶ 28.)

Virginia Tummelson, the Dietary Manager at Stateville, also provided her affidavit. In it she states that providing different diets with differing food and preparation requirements is a heavy burden on dietary staff. (Tummelson Aff. at ¶ 4.) Rather than providing multiple vegetarian diets, Stateville provides the vegan diet because, as a strict vegetarian diet, it meets the exclusion requirements of all vegetarian diets. (*Id.* at ¶9.) She states that Goodman could follow a less restrictive vegetarian diet by having the regular diet and not eating the meat. (*Id.* at ¶10.) She is able to check off which items are or contain ingredients that are contrary to a specific diet when reviewing the list of food items sold to inmates through the commissary. If individual inmates were permitted to vary from the special diets, then checking for any such conflicts would be more complex and, in her view, unmanageable. (*Id.* at ¶ 14.) She states that if Goodman were put on a vegan diet and then allowed to purchase food items contrary to the vegan diet, he would be in a unique position. As a result, numerous other inmates would ask for special diet accommodations, which would result in significantly increased costs and demands on resources. (*Id.* at 19.)

In his response, Goodman has countered each of the points made in the affidavits with equally persuasive arguments. Most significant is his claim that Commissary Supervisors Chamille Howe CSS II, Terry Boner CSS II, and Thomas Garvey CSS II, have stated that there has never been a policy at Stateville to monitor commissary purchases for dietary restrictions. They also stated that the kitchen staff lack access to the commissary purchase and trust fund sites on the computer to monitor these purchases. Goodman claims that he was unable to obtain affidavits from

6

these supervisors because it is against departmental policy for them to make sworn statements beneficial to inmates.

Goodman has moved to request sanctions on defendants. He essentially claims that Warden Briley committed perjury in his affidavit because he stated that "[a]dditionally, inmates are not allowed to burn incense or herbs or any other items in their cells," although Warden Briley is fully aware that inmates are allowed to purchase tobacco products and smoke them in their cells. In their reply, defendants argue that it is commonly understood that people "smoke" cigarettes; they do not "burn" them. The court agrees that Warden Briley was clearly referring to incense, herbs, candles, or other similar items that are burned and not to cigarette smoking. Goodman's motion is denied.

Defendants contend that there are remaining issues of fact and that the court should deny Goodman summary judgment and allow the case to go to trial. Goodman has also moved for a limited evidentiary hearing and to compel discovery.

Serious issues are at stake here. Defendants contend that allowing tarot cards will compromise security and that allowing Goodman to supplement the vegan diet will burden the dietary staff. Goodman, however, has a right to the free exercise of his religion, albeit it is not a mainstream religion. Goodman has claimed that he is unable to obtain necessary affidavits from several workers in regard to monitoring commissary purchases. It will also be difficult for him to conduct proper discovery and possibly obtain expert witnesses. Although he has done a commendable job of representing himself, the court will appoint counsel to represent him so that these issues will be fully aired at trial. At a status hearing on December 19, 2001, at 9:30 a.m., the court will set dates for discovery cutoff and trial. It is therefore premature to set this case for an evidentiary hearing at this time and denies Goodman's motion. The court also denies Goodman's motion to compel discovery without prejudice to Goodman's counsel making such motion, if necessary.

## III. CONCLUSION

For the foregoing reasons, the court finds that there are material issues of fact and denies summary judgment to Goodman. Goodman's motion to request sanctions on defendants, motion

7

for limited evidentiary hearing, and motion to compel discovery are denied. Erik L. Kantz, Arnstein & Lehr, 120 S. Riverside Plaza, Ste. 1200, Chicago, IL 60606 (312/876-6671), is appointed to represent Goodman.

IT IS SO ORDERED

George W. Lindberg
United States District Judge

Date: NOV 2 8 2001